1  **WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patricia Grimes-Ramey,<br><br>    Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of Social Security,<br><br>    Defendant. | No. CV 10-00234-PHX-EHC<br><br>**ORDER** |

This is an action for judicial review of a denial of disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g), regarding the period of October 2003 through September 29, 2005. The matter is fully briefed (Doc. 13, 14 & 17).

Plaintiff applied for disability benefits in or about October 2003 (Administrative Record [Tr.]) at approximately 43 years of age (Tr. 94-96). Plaintiff alleged an amended disability onset date of October 14, 2003 (Tr. 48, 94). Her application was denied (Tr. 42-43). After a hearing (Tr. 589-615), the Administrative Law Judge ("ALJ") issued a partially favorable decision on February 21, 2006 finding that Plaintiff was not disabled from October 14, 2003 through September 29, 2005 but that she was disabled (due to mental impairments) beginning September 30, 2005 (Tr. 48-52). The Appeals Council granted Plaintiff's request for review and on May 4, 2007 affirmed the ALJ's finding of disability beginning September

1  30, 2005 (Tr. 91-93). The Appeals Council remanded for consideration of whether Plaintiff
2  was disabled prior to September 30, 2005 (Tr. 91-93).
3       On remand, the ALJ held another hearing (Tr. 616-656) and on September 13, 2007
4  issued a decision finding that Plaintiff was not disabled from October 2003 through
5  September 29, 2005 (Tr. 24-33). The ALJ listed Plaintiff's severe combination of impairments
6  as affective and anxiety disorder, a muscle disorder, asthma, essential tremors, and mild
7  obesity (Tr. 26). On December 3, 2009, the Appeals Council denied review (Tr. 9-12),
8  making the ALJ's decision the final decision for purposes of review.

**I.**

Standard of Review

11      A person is "disabled" for purposes of receiving social security benefits if he or she
12 is unable to engage in any substantial gainful activity due to a medically determinable
13 physical or mental impairment which can be expected to result in death or which has lasted
14 or can be expected to last for a continuous period of at least twelve months. Drouin v.
15 Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992). Social Security disability cases are evaluated
16 using a five-step sequential evaluation process to determine whether the claimant is disabled.
17 The claimant has the burden of demonstrating the first four steps. Tackett v. Apfel, 180 F.3d
18 1094, 1098 (9th Cir. 1999).

19      In the first step, the ALJ must determine whether the claimant currently is engaged in
20 substantial gainful activity; if so, the claimant is not disabled and the claim is denied. The
21 second step requires the ALJ to determine whether the claimant has a "severe" impairment
22 or combination of impairments which significantly limits the claimant's ability to do basic
23 work activities; if not, a finding of "not disabled" is made and the claim is denied. At the
24 third step, the ALJ determines whether the impairment or combination of impairments meets
25 or equals an impairment listed in the regulations; if so, disability is conclusively presumed and
26 benefits are awarded. If the impairment or impairments do not meet or equal a listed
27 impairment, the ALJ will make a finding regarding the claimant's "residual functional

capacity" based on all the relevant medical and other evidence in the record. A claimant's residual functional capacity ("RFC") is what he or she can still do despite existing physical, mental, nonexertional and other limitations. Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). At step four, the ALJ determines whether, despite the impairments, the claimant can still perform "past relevant work"; if so, the claimant is not disabled and the claim is denied. The Commissioner bears the burden as to the fifth and final step of establishing that the claimant can perform other substantial gainful work. Tackett, 180 F.3d at 1099.

The Court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g). The decision to deny benefits should be upheld unless it is based on legal error or is not supported by substantial evidence. Ryan v. Commissioner of Social Security, 528 F.3d 1194, 1198 (9th Cir. 2008). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). The Court must consider the record in its entirety and weigh both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir.1985).

## II.

### Background Facts

Between July 2002 and December 2002, Plaintiff was treated by Dheeren Raikhelkar, M.D., for depression, panic, anxiety and agoraphobia[1] (Tr. 211, 207, 210, 206, 205). In March 2003, Plaintiff was assessed with continuing panic disorder and her Global Assessment

---

[1]Agoraphobia refers to "[a] mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or avoided; often associated with panic attacks." Stedman's Medical Dictionary, at 37 (27th ed. 2000).

- 3 -

of Functioning ("GAF")[2] score was 65 (Tr. 202). Plaintiff reported difficulty leaving home without her daughter (Tr. 202). In June 2003, Plaintiff's GAF score was 65 (Tr. 197).

On June 24, 2003, Plaintiff's examination by Charanjit Dhillon, M.D., disclosed tremor of the outstretched upper extremities, possible bilateral carpal and cubital tunnel syndrome, and tendinitis (Tr. 178-179). As of August 2003, Plaintiff benefitted from wearing carpal tunnel splints but she sometimes removed them and her symptoms had recurred. Dr. Dhillon recommended that Plaintiff wear the braces and referred her to a hand surgeon (Tr. 176). Plaintiff's GAF score in September 2003 was 60 (Tr. 195).[3]

In October 2003, Dr. Dhillon prescribed Mysoline to treat Plaintiff's hand tremor (Tr. 173-174) and then Topamax (Tr. 375, 373, 372). By April 27, 2004, Plaintiff's hand tremor was well-controlled with Topamax, 50 mg., with no side effects (Tr. 370-371).

In May and November 2003, Ronald Varns, M.D., a family practitioner, noted Plaintiff's diagnosis of carpal tunnel syndrome (including tremor), asthma, depression and anxiety (Tr. 301, 303).

On April 19, 2004, Robert Wilson, M.D., a hand surgeon, diagnosed Plaintiff with bilateral median nerve compression and tendinitis (both forearms). Plaintiff's muscle strength was normal and she had full range of motion in her elbows and fingers (Tr. 367-368).

In October 2003, and March and May 2004, Dr. Raikhelkar reported Plaintiff's normal mental health findings. Plaintiff's GAF score was assessed at "about 55" to 66 (Tr. 189, 380-381, 378).

---

[2] A GAF score is an estimate of an individual's psychological, social and occupational functioning that is used to reflect the person's need for treatment. See Vargas v. Lambert, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998). A GAF score of 61 to 70 indicates some "mild symptoms" (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning (Doc. 14 at 3 n.2).

[3] A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect, occasional panic attacks) or moderate difficulty in social, occupational and school functioning (e.g., few friends, conflicts with peers or co-workers) (Doc. 14 at 4 n. 3).

In May 2004, a State Agency reviewing physician reported that Plaintiff could occasionally lift/carry 50 pounds and frequently lift/carry 25 pounds; could stand/walk for about 6 hours in an 8-hour workday; could sit for about 6 hours in a day; and, had some manipulative limitations in handling and fingering (Tr. 255-264).

On June 11, 2004, Brent Geary, Ph.D., performed a consultative mental status examination and reported Plaintiff's assessments as normal with intellect in the "low average range" (Tr. 271-277 [272]). Dr. Geary diagnosed Plaintiff with "Dysthymic Disorder of Late Onset, Currently Mild,"[4] "Panic Disorder Without Agoraphobia, Moderate," and Pain Disorder with psychological factors and medical conditions (Tr. 274). Plaintiff said she last worked in 1990 "doing hair" and reported drowsiness from her psychotropic medications (Tr. 273). Dr. Geary found that Plaintiff was not significantly limited in her abilities to follow work rules; relate to coworkers and supervisors; deal with the public; exercise judgment; function independently; maintain attention and concentration; recollect and perform simple as well as detailed (but not complex) job instructions; maintain personal appearance; relate predictably in social situations; and demonstrate reliability (Tr. 274, 276-277). Plaintiff was significantly limited in her ability to cope with customary work stress; remember and carry out complex job instructions; and behave in an emotionally stable manner (Tr. 274).

On June 15, 2004, Elinor Schottstaedt, M.D., conducted a consultative exam, noting that Plaintiff was scheduled for hand surgery the next week (Tr. 265). Plaintiff reported that she could attend to her personal needs; fix meals; occasionally sweep the kitchen; empty the garbage can; climb stairs (with some knee pain); walk about 500 yards; stand for 15 minutes to an hour (with some knee pain); shop for groceries late in the day to avoid people; and read

---

[4]The term dysthymic relates to dysthymia. Dysthymia refers to "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." Stedman's Medical Dictionary, at 556 (27th ed. 2000).

(Tr. 266). Plaintiff's physical exam revealed normal findings in extremities, grip strength, hands and lungs. She was able to go the length of the interview without an anxiety attack and her neurologic exam was normal except when she demonstrated tremors in her hands (Tr. 267). Dr. Schottstaedt reported that Plaintiff's asthma, irritable bowel syndrome, essential tremor, anxiety, and depression were well controlled (Tr. 267). Plaintiff had no restrictions in lifting/carrying and she could stand/walk for 6 hours in an 8-hour day; sit for 6 hours in an 8-hour day; frequently engage in postural activities; and had no manipulative, visual, communicative, or environmental limitations (Tr. 269-270).

On June 17, 2004, Dr. Wilson performed carpal tunnel syndrome surgery ("median nerve decompression") on Plaintiff's left wrist.[5] By June 28, 2004 the pain from the surgery had "mostly resolved" and the incisions were well-healed (Tr. 365).

On June 25, 2004, James Campbell, a State Agency physician, reviewed Plaintiff's medical records and opined, as to Plaintiff's mental RFC, that Plaintiff was not significantly limited in any area of functioning related to work (Tr. 280-282).

On July 19, 2004, Dr. Wilson noted that Plaintiff's grip and pinch strength were significantly reduced, her finger motion was full and there was some fingertip numbness (Tr. 364). On July 27, 2004, Dr. Dhillon noted Plaintiff's "good improvement in the hand numbness" following surgery and her good response to her essential tremor with Topamax (Tr. 369).

On August 4, 2004, Dr. Varns completed a medical information form and answered yes to whether there were conditions that "impair [Plaintiff's] employability," stating that Plaintiff had been diagnosed with carpal tunnel syndrome, including tremor, and was "in [the] process of surgery" (Tr. 299). Dr. Varns provided August 2004 to August 2005 as Plaintiff's

---

[5]This record referring to surgery on Plaintiff's right wrist appears to be in error as Plaintiff has clarified that surgery was performed on her left wrist (see Doc. 13 at 7 n. 2).

length of disability with a "fair" prognosis and recommended re-evaluation in 6 to 9 months, or by February 2005 (Tr. 299).

In July and August 2004, Dr. Raikhelkar's mental examinations of Plaintiff showed normal findings, that she was "doing very well" on her medications, and that her GAF scores were 55 (Tr. 376-377).

Plaintiff had previously reported difficulty with driving, grasping, reaching, and buttoning but in August 2004, after a month of physical therapy, she reported improvement to the point that she needed "[m]inimal assistance" with activities of daily living (Tr. 384). Connie Johnson, an occupational therapist, noted Plaintiff's report that she could not work "secondary to dysfunction" (Tr. 387, 394). Objectively, Ms. Johnson reported improvement in Plaintiff's grip strength and range of motion in her wrist, and that her stiffness/motion loss had decreased to "slight levels" (Tr. 384-385). Ms. Johnson opined that Plaintiff's overall rehabilitation potential was "good" and she exhibited "a fair prognosis at time of discharge" (Tr. 384).

On August 18, 2004, Dr. Varns reported that Plaintiff suffers from situational anxiety as a result of being physically assaulted in "March, June (throughout May)" as she was "stalked by [a] maintenance man" (Tr. 409).

In November 2004, Dr. Dhillon examined Plaintiff's upper left shoulder, arm, wrists, and hand and found no abnormalities (Tr. 460).

In December 2004, Ken Wysocki, a nurse practitioner with Dr. Varns, completed a check-box form noting Plaintiff's diagnosis of "hand tremor/weakness" (Tr. 307-309). Nurse Wysocki opined that Plaintiff could sit more than one hour but less than 2 hours in an 8-hour workday; stand more than one hour but less than 2 hours in a workday; walk more than one hour but less than 2 hours; lift less than 10 pounds; occasionally use her left hand on a repetitive basis; occasionally bend, crawl, and climb; frequently reach, stoop, balance, crouch, and kneel; not be exposed to unprotected heights, moving machinery, or dust, fumes and gases (Tr. 308-309).

On February 10, 2005, Dr. Dhillon reported on Plaintiff's "good response" to her left carpal tunnel surgery (Tr. 458). On April 21, 2005, Dr. Dhillon reported that Plaintiff's tremor was well controlled except when she missed her medication (Tr. 457).

On May 12, 2005, Grace Keckeisen, a nurse practitioner, pursuant to a psychiatric examination, found that Plaintiff exhibited dysthymic mood and overall normal results other than a fear of leaving the house at times (Tr. 324-327). Plaintiff's GAF score was 65 (Tr. 328). On May 13, 2005, family therapist Heather McCoy noted Plaintiff's reports of a stressful month and that she had made "superficial scratches on herself using an exacto knife" (indicating she had "cut" on herself) some two weeks earlier (Tr. 339).[6]

On May 20, 2005, Peter Freedman, M.D., examined Plaintiff regarding her asthma complaints and reported mostly normal findings with mild nasal symptoms (Tr. 360). Plaintiff's cat played a role in her symptoms, she had been warned about this, but had gotten the cat anyway (Tr. 359-360). Dr. Freedman diagnosed Plaintiff with reactive airway disease and allergic rhinitis (Tr. 359-360).

On June 14, 2005, Plaintiff reported "episodes of cutting" to Dr. Varns. Dr. Varns diagnosed asthma, depression, and anxiety (Tr. 435).

On June 15, 2005, Plaintiff was seen by Susan Anderson, a mental health nurse practitioner, and reported suffering an anxiety attack at a supermarket and that she had cut herself on the anniversary of a sexual assault (Tr. 322-323). Plaintiff exhibited: normal affect; anxious mood; normal thought processes; normal thought content; good cognition; fair insight; and fair judgment (Tr. 322-323). Ms. Anderson reported similar findings regarding

---

[6]Self-mutilation refers to maiming or injuring the self, may involve wrist cutting or hair pulling, and may occur as part of a suicide attempt and may represent a discharge of aggression against the self. Campbell's Psychiatric Dictionary, at 888 (9th ed. 2009). Deliberate self-harm syndrome refers to "[c]onscious and willful inflicting of painful, destructive, or injurious acts on one's own body without intent to kill" and frequently involves wrist cutting. The subject typically "feels mounting tension and an impelling impulse to act, followed by a feeling of relief after the injury has been inflicted on the self." Id. at 259.

1  examinations on July 14, 2005 and August 20, 2005, except that Plaintiff had exhibited an
2  increased desire to cut herself or pull her hair out (Tr. 314-317). Plaintiff's GAF scores were
3  at 55 (Tr. 315, 317, 323). On August 10, 2005, Plaintiff was seen by a therapist at the suicide
4  prevention center for a depressive disorder (Tr. 331). Between August 30 and September 1,
5  2005, the therapist noted Plaintiff's reports that she had "cut" herself (Tr. 329-330).

6  On September 7, 2005, Ms. Anderson reported that Plaintiff was "traumatized by
7  events in Louisiana (Hurricane Katrina) where she had lived previously" and that Plaintiff
8  said she had "started cutting on herself again" (Tr. 311). Plaintiff's GAF score was assessed
9  at 50 (Tr. 312).[7]

## III.

### The Hearings Before the ALJ

*Hearing on December 14, 2005*

Plaintiff, represented by counsel, testified she could not work due to her panic/anxiety disorder, combined with the side effects (drowsiness) of her psychotropic medications (Tr. 596-597). She said she did not leave the house except to shop at night and to attend doctor's appointments (Tr. 597-598, 603). Plaintiff said she had depression (expressing concern "for our troops and the people in Louisiana and who have suffered through the tsunami") (Tr. 600). Plaintiff sometimes cuts herself but is seeking help for that (Tr. 601-602). She regularly takes two long naps during the day and has trouble sleeping at night (Tr. 603-604).

Plaintiff testified that she has carpal tunnel syndrome, she had surgery on her left wrist, and that her left wrist did not bother her except "when it's cold" (Tr. 605). As for her right wrist, Plaintiff has trouble holding, carrying, and grasping "heavy items" (such as a container of milk) (Tr. 605). Plaintiff anticipated having surgery on her right arm in the ensuing year (Tr. 605). Plaintiff said she has essential tremor in her hands which sometimes makes it

---

[7] A GAF of 41-50 indicates serious symptoms, e.g., suicidal ideation, "or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Tagger v. Astrue, 536 F. Supp. 2d 1170, 1173 n.4 (C.D. Cal. 2008).

- 9 -

1  difficult to scoop food (such as soup) and she uses utensils that are wide handled and easier
2  to hold (Tr. 606). Plaintiff can still drive and had driven two days prior to the hearing (Tr.
3  608).

*Hearing on August 8, 2007*

This hearing occurred following remand from the Appeals Council (Tr. 618). Plaintiff was represented by counsel (Tr. 618). The ALJ called two medical experts to testify about the onset of Plaintiff's disability. At issue was the period from October 2003 to September 30, 2005 (Tr. 618).

Michael Gurvey, M.D., testified regarding Plaintiff's physical impairments relevant to October 2003 through September 2005 based on his review of Plaintiff's medical records (Tr. 630). Dr. Gurvey identified Plaintiff's medically determinable impairments as carpal tunnel syndrome, bilateral ("status post carpal tunnel release, 6/17/04") including essential tremor, and asthma (Tr. 630-631). Dr. Gurvey reported that Plaintiff's asthma was stable and did not present any particular problems (Tr. 631-632). Dr. Gurvey testified that the essential tremors present with Plaintiff's carpal tunnel syndrome were largely controlled by medication and did not present a serious functional problem for her (Tr. 632). Plaintiff had a "very good result" following her carpal tunnel surgery in mid-2004 and the normal healing time for the surgery was about 6 weeks (Tr. 633-634). Dr. Gurvey was not aware of the current status of Plaintiff's other wrist but if it was "significant" a release would have been performed (Tr. 633). Plaintiff's medical records showed little information related to carpal tunnel syndrome after her last neurological evaluation in 2004 (Tr. 635). Dr. Gurvey testified that post-surgery Plaintiff would have no restrictions other than avoiding a "chronic flexed wrist position" and activities such as repetitive fingering for prolonged periods of time (e.g., keyboarding for 30 minutes at a time without breaks) (Tr. 632). Dr. Gurvey opined that Plaintiff would have no problem with grasping, twisting, and turning of hands during the relevant period (October 2003 through September 2005) (Tr. 633).

1     Edward Jasinski, a clinical psychologist, reviewed Plaintiff's medical records and
2 testified regarding her mental impairments (Tr. 635-636), noting she had been treated for
3 depression and anxiety disorder, including panic disorder, agoraphobia, and occasional cutting
4 (to cope with stress) (Tr. 636-637, 642). Dr. Jasinski opined that Plaintiff's medical records
5 for the period October 2003 through September 2005 showed "only mild to moderate
6 symptoms in terms of the GAF's [GAF scores]" (Tr. 636, 638). Plaintiff's medical providers
7 found that she had decompensated in September 2005 due to symptoms secondary to an
8 external event in Louisiana (Tr. 638). Dr. Jasinski opined that, prior to September 2005,
9 Plaintiff had the ability to perform a low stress job with simple tasks only (Tr. 637).

*Testimony of Vocational Expert at the August 8, 2007 Hearing*

    The ALJ asked David Janus, the vocational expert ("VE"), to consider a hypothetical person of Plaintiff's age, education, and vocational background; who could do medium work, except that she was limited to frequent fingering and handling and must avoid high concentrations of dust, fumes, and gases; and avoid confrontational, high stress positions and was limited to simple tasks without high production quotas (Tr. 644-645). VE Janus responded that such a person could perform the occupations of: packager (medium, unskilled); kitchen prep worker (medium, unskilled); and office helper (light, unskilled) (Tr. 645-646). When asked by the ALJ to consider that the person was limited to light work and occasional fingering and grasping, VE Janus testified that such a person could perform the occupation of counter clerk (light, unskilled) (Tr. 646-647). VE Janus said that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") (Tr. 647).

**IV.**

The ALJ's Findings

    In a written decision dated September 13, 2007 (Tr. 24-33), the ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date of October 14, 2003 and that Plaintiff's severe combination of impairments included affective and anxiety disorder, a muscle disorder, asthma, essential tremors, and mild obesity (Tr. 26).

Plaintiff did not have an impairment or combination of impairments that met or medically equaled impairments listed in the regulations (Tr. 27). Plaintiff has a high school degree and no past relevant work (Tr. 31).[8]

The ALJ found that from October 2003 to September 30, 2005, Plaintiff had the residual functional capacity to perform medium work including that she could frequently handle and finger; was limited to simple tasks without high production quotas; and should avoid high exposure to pulmonary irritants(Tr. 28). The ALJ found that the evidence showed that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms but Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not accepted to the extent alleged (Tr. 29).

The ALJ determined that Plaintiff's mental impairments were not disabling and her anxiety attacks were reduced by medication (Tr. 30). Plaintiff's medical impairments were not disabling and she was not fully compliant with her treatment (Tr. 30). The ALJ discussed that the opinions of Dr. Varns and Nurse Practitioner Wysocki were inconsistent with the totality of the treatment records as set forth in the objective opinion of Dr. Gurvey (Tr. 30).

The ALJ gave weight to the State Agency medical opinions as consistent with the record as a whole (Tr. 31). The ALJ gave substantial weight to the opinions of testifying professionals Dr. Gurvey and Dr. Jasinski finding they were consistent with each other and with the medical evidence (Tr. 31). The ALJ gave the opinion of Ms. Ramey regarding Plaintiff's limitations little weight as not supported by the record (Tr. 31).

The ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform (Tr. 31). The ALJ credited the VE's testimony that such jobs included packager (unskilled, medium), kitchen prep worker (unskilled, medium), office helper (unskilled, light), and counter clerk (unskilled, light) (Tr. 32). The ALJ

---

[8]Plaintiff previously worked as a hairdresser (Tr. 607).

1  concluded that Plaintiff was not disabled for the period of October 2003 to September 30,
2  2005 (Tr. 32).

## V.

### Discussion

Plaintiff argues that the ALJ erred at step two of the sequential evaluation process by not finding that her carpal tunnel syndrome was a severe impairment during the relevant period and further erred in determining she has the residual functional capacity for medium to light work. Plaintiff requests a finding of disability regarding the relevant period and an award of benefits or, in the alternative, remand for further proceedings.

Defendant argues that substantial evidence supports the ALJ's decision that Plaintiff could perform a reduced range of medium work and that she was not disabled for the relevant period. Defendant contends that the decision should be affirmed but if the Court finds that the ALJ improperly discounted medical or testimonial evidence, the case should be remanded for further proceedings.

The narrow issue presented in this appeal is whether Plaintiff is entitled to benefits for the period from October 2003 to September 29, 2005. The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations. Social Security Ruling ("SSR") 83-20. Sam v. Astrue, 550 F.3d 808, 809-810 (9th Cir. 2008). The onset date is to be fixed based on the facts as consistent with the medical evidence of record. Id.

With respect to Plaintiff's first argument regarding error at step two, a severe impairment is one that significantly limits a person's ability to perform "basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). See, Carmickle v. Commissioner, 533 F.3d 1155, 1164-1165 (9th Cir. 2008)(where the medical record did not establish any work-related limitations as a result of claimant's carpal tunnel syndrome impairment, ALJ did not err in concluding that it was not a "severe" impairment at step two). Plaintiff argues that the ALJ should have credited the August 2004 opinion of treating physician Dr. Varns (Tr. 299)

- 13 -

1  that Plaintiff's carpal tunnel syndrome, including tremor, affected Plaintiff's employability
2  and that her length of disability was August 2004 to August 2005.

3  Defendant argues that the ALJ's failure to find that Plaintiff's carpal tunnel syndrome
4  is itself a severe impairment, if error, was harmless. The ALJ did not screen out Plaintiff's
5  claim at step two. Rather, the ALJ found that Plaintiff had severe impairments that required
6  proceeding to the further steps of the sequential evaluation process at which the ALJ had to
7  consider all of Plaintiff's impairments, including those that were not severe. 20 C.F.R. §§
8  416.923, 416.945.

9  In assessing Plaintiff's residual functional capacity, the ALJ considered Plaintiff's
10 mental and medical impairments. The ALJ discussed the results of Dr. Schottstaedt's overall
11 normal examination (good grip strength and sensation intact to the touch in the right hand);
12 Plaintiff's good improvement in reducing numbness following surgery on her wrist; and, the
13 August 2004 occupational therapist's report that Plaintiff's overall rehabilitation potential was
14 good (Tr. 29-30). Any alleged error by the ALJ in not finding that Plaintiff's carpal tunnel
15 syndrome was a severe impairment was harmless. See Lewis v. Astrue, 498 F.3d 909, 911
16 (9th Cir. 2007).

17 Plaintiff's claim of error in the determination of her residual functional capacity is
18 based on several grounds. Plaintiff argues that the ALJ did not discuss how the combination
19 of her impairments affected her ability to sustain work activities 8 hours per day, 5 days per
20 week; the ALJ did not properly weigh the treating physician's opinion regarding Plaintiff's
21 physical impairments; the ALJ did not properly consider Plaintiff's symptom evidence and
22 testimony; and, the ALJ did not properly consider the effect of Plaintiff's "cutting" activity.

23 Plaintiff contends that the ALJ did not properly consider the opinions of treating
24 physician Dr. Varns or Nurse Wysocki. Where a treating doctor's opinion is uncontradicted,
25 an ALJ may reject it only for "clear and convincing" reasons; however, a contradicted opinion
26 of a treating or examining physician may be rejected for "specific and legitimate" reasons.
27 See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). An ALJ may consider opinions

from sources other than "acceptable medical sources," such as a nurse practitioner, to show the severity of the claimant's impairment(s) and how the impairment(s) affect the claimant's ability to work. 20 C.F.R. § 416.913(d)(1).

Following Plaintiff's assessment of possible carpal tunnel syndrome in June 2003 (Tr. 178-179), Dr. Wilson diagnosed bilateral median nerve compression and tendinitis (both forearms) in April 2004 (Tr. 368). As of April 2004, Plaintiff's hand tremor was reasonably well-controlled on Topamax, with no side effects (Tr. 370). In May 2004, a State Agency reviewing physician reported that Plaintiff could lift/carry 50 to 25 pounds, but had some manipulative limitations in handling and fingering (Tr. 256-262). In June 2004, examining physician Dr. Schottstaedt reported normal findings regarding Plaintiff's extremities, grip strength, and hands, with no manipulative limitations (Tr. 267-270). Dr. Wilson performed carpal tunnel surgery on Plaintiff's left wrist in June 2004 (Tr. 365). By July 2004, Plaintiff's grip and pinch strength were significantly reduced and there was fingertip numbness but her finger motion was full (Tr. 364). Some ten days later, Dr. Dhillon reported "good improvement" regarding Plaintiff's hand numbness and good response with Topamax regarding Plaintiff's essential tremor (Tr. 369). In August 2004, after a month of physical therapy, Plaintiff demonstrated improvement with driving, grasping, reaching, and buttoning; and with grip strength and range of motion in her wrist (Tr. 384-385). Plaintiff's stiffness and motion loss had decreased to "slight levels" (Tr. 384-385). Dr. Dhillon's November 2004 exam revealed no abnormalities regarding Plaintiff's upper left shoulder, arm, wrists and hand (Tr. 460). Reports in February and April 2005 showed "good response" to Plaintiff's carpal tunnel surgery and that her tremor was well-controlled except when she missed her medication (Tr. 457-458).

Dr. Gurvey testified to minimal limitations (avoid chronic flexed wrist position and activities such as repetitive fingering) due to Plaintiff's carpal tunnel syndrome, that Plaintiff's records showed "very good result" post-surgery, and that the normal healing time was at least 6 weeks (Tr. 632-634). Plaintiff testified at the December 2005 hearing that her

left wrist did not bother her anymore except when it is cold (Tr. 604-605). While Plaintiff testified regarding limitations involving her right wrist and said she anticipated surgery on that arm (Tr. 605), Dr. Gurvey testified at the August 2007 hearing that if the problem on Plaintiff's wrist were significant, a release would have been performed (Tr. 633).

The ALJ did not err in not affording significant weight to Dr. Varns' opinion that Plaintiff was disabled from August 2004 to August 2005 due to carpal tunnel syndrome (Tr. 30). Dr. Varns did not perform the surgery and does not appear to have provided relevant treatment to Plaintiff post-surgery. A physician's statement that a claimant is unable to work is not entitled to special weight. Tonapetyan v. Halter, 242 F.3d 1144, 1148-1149 (9th Cir. 2001); see 20 C.F.R. § 416.927(e). The ALJ also did not err in not affording controlling weight to the December 2004 opinion of Nurse Wysocki that Plaintiff was unable to work due to her "hand tremor/weakness" and asthma. Nurse Wysocki's opinion conflicted with Dr. Freedman's May 2005 exam of Plaintiff noting mostly normal findings with mild nasal symptoms and diagnosis of reactive airway disease and allergic rhinitis (Tr. 359-360). Nurse Wysocki's assessment regarding Plaintiff's "hand/tremor weakness" is not consistent with the substantial medical evidence regarding Plaintiff's carpal tunnel syndrome. A non-acceptable medical source like a nurse cannot be considered a "treating source," and the opinion of a nurse is not entitled to "controlling weight." See, e.g., Kohler v. Astrue, 546 F.3d 260, 268 (2d Cir. 2008).

With respect to Plaintiff's argument that the ALJ did not properly consider the combination of her impairments, the ALJ discussed the limitations caused by Plaintiff's mental impairments based on the opinions of Drs. Jasinski and Geary (Tr. 27-28). The ALJ adopted Dr. Gurvey's opinion regarding Plaintiff's medical impairment that she could perform some work within limitations as set out within the ultimate RFC finding (Tr. 27). The ALJ then set forth his RFC determination that included the requisite findings regarding lifting or carrying; sitting, standing and walking; and that Plaintiff could frequently handle and finger, was limited to simple tasks without high production quotas, etc. (Tr. 28). The ALJ discussed

the medical evidence that supported this finding and regarding his assessment of Plaintiff's symptom evidence as including Dr. Schottstaedt's June 2004 examination opinion; Dr. Raikhelkar's reports and Plaintiff's GAF scores prior to September 2005; Plaintiff's good improvement as a result of the carpal tunnel surgery and that her hand tremors were reasonably well-controlled with medication; and Dr. Gurvey's opinion that Plaintiff's asthma was not particularly serious. The ALJ mentioned Dr. Gurvey's opinion that Plaintiff would have no restrictions in the workplace other than manipulative limitations (Tr. 30-31).

Of concern to the Court, however, is the record evidence of Plaintiff's "cutting" activity when considered with her mental impairments relevant to the ALJ's RFC determination. The ALJ found that prior to September 2005, Plaintiff had continued to improve and "described a breakthrough where she thought of cutting herself but did not follow through" (Tr. 30).

Between July 2002 and May 2003, Plaintiff was treated for depression, anxiety and panic disorder (Tr. 211, 207, 210, 206, 205, 202, 303). Plaintiff's mental health exams thereafter were overall normal into May 2005 and no significant limitations were reported (Tr. 189, 381, 380, 376-377, 237-253, 280-281), with two exceptions. In June 2004, Dr. Geary conducted a consultative mental status exam and reported that Plaintiff was significantly limited in her ability to cope with customary work stress and to behave in an emotionally stable manner (Tr. 274). In August 2004, Dr. Varns reported Plaintiff's "situational anxiety" as a result of a physical assault some 3 to 5 months earlier (Tr. 409). Plaintiff's "cutting" activity appears in the record on or about May 12-13, 2005 (Tr. 324, 339). In June 2005, Dr. Varns noted Plaintiff's report of "cutting" activity (Tr. 435). In July and August 2005, Plaintiff had an increased desire to cut herself and pull out her hair (Tr. 314-317). Plaintiff "cut" herself between the end of August and into September 2005 (329-331, 311-312). Dr. Jasinski testified that Plaintiff's GAF scores during this period were in the range of 55 to 65 (indicating mild to moderate limitations) until she "decompensated" in September 2005, a finding supported by the record. However, while "[a] GAF score may help

1 an ALJ assess mental RFC, ...it is not raw medical data." Smith v. Astrue, 565 F. Supp. 2d 918, 925 (M.D. Tenn. 2008). Plaintiff's counsel questioned the VE regarding a person with limitations that included cutting themselves periodically at the workplace. The VE testified that an employer would not likely tolerate "cutting" activity (Tr. 650). The ALJ erred in not considering Plaintiff's "cutting" activity as part of her mental impairment and limitations affecting her ability to sustain work activities.

The ALJ must consider all symptoms and pain which "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). Unless there is affirmative evidence of malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Dr. Jasinski testified that there was no evidence of exaggeration or malingering (Tr. 640). The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms but Plaintiff's statements regarding the intensity, persistence and limiting effects of the symptoms were not accepted to the extent alleged regarding the period prior to September 2005 (Tr. 29-31). As previously discussed, the ALJ did not properly consider Plaintiff's "cutting" activity.

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000). The issue turns on the utility of further proceedings. Plaintiff's May 13, 2005 medical record shows that Plaintiff reported to a therapist that she had "cut" herself some two weeks earlier (Tr. 339). The VE testified that an employer would not likely tolerate "cutting" activity. Plaintiff's onset date of disability therefore is May 1, 2005. No outstanding issue remains to be resolved and it is clear the ALJ would be required to find Plaintiff disabled for the period commencing May 1, 2005. See Varney v. Sec'y of HHS, 859 F.2d 1396, 1400-1401 (9th Cir. 1988). The decision of the Commissioner will be reversed and the matter will be remanded for an award of benefits with a disability onset date of May 1, 2005.

//

Accordingly,

**IT IS ORDERED** that the decision of the Commissioner is reversed and the matter is remanded for an award of benefits with a disability onset date of May 1, 2005.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter Judgment accordingly.

DATED this 5th day of July, 2011.

_____
Earl H. Carroll
United States District Judge